CONKLIN v. UNITED CONSTRUCTION & SUPPLY CO. et al. (No. 6814.)

(Supreme Court, Appellate Division, First Department. February 5, 1915.)

1. CORPORATIONS (§ 99*)—ISSUANCE OF STOCK—ACTS CONSTITUTING.

J. and C. organized a corporation with a capital stock of $100,000, only $2,000 of which stock was issued and paid for. Representations had been made leading the public to believe that the whole amount had been paid in, and there were claims that these representations came dangerously near the line of criminal responsibility. Because of uneasiness over this situation, worthless stock in other corporations was placed in the hands of the treasurer, as an attempted justification of the representations; but no one interested in the company regarded that this amounted to an issuance and payment for the stock, and no stock was in fact issued. Subsequently, C. having refused to take and pay for his part of the unissued stock, it was all issued to J. *Held,* that the contention that the stock was paid for by the deposit of the worthless stock mentioned, and that C. was therefore under no necessity of subscribing for and taking any share of the unissued stock in order to have an equal interest in the company with J., was without foundation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 444–446; Dec. Dig. § 99.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**2. CORPORATIONS (§ 30*)—PROMOTERS—RIGHTS AND LIABILITIES.**

J. and C., who were long associated in business, organized a number of corporations by which various operations were conducted. One of such corporations had a capital stock of $100,000, only $2,000 of which had been issued and paid for, and because of the company's financial embarrassment C. was urged, but refused, to take and pay for one-half of the unissued stock. J. thereupon took the whole of such unissued stock, paying therefor with the stock of another of the corporations. C. sought to have this stock canceled and dividends thereon repaid to the company. *Held*, that the contention that all of the corporate entities should be disregarded, and the entire venture treated as a joint enterprise, and the rights of the parties determined as participants in such joint venture, and not as stockholders in a corporation, was without merit.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 97–100; Dec. Dig. § 30.*]

**3. CORPORATIONS (§ 110*)—STOCK—CANCELLATION.**

J. and C. organized a corporation with a capital stock of $100,000, only $2,000 of which was paid in. The company subsequently became embarrassed, and C. was repeatedly urged by J. and by the directors and treasurer of the corporation to take and pay for one-half of the unissued stock, but repeatedly refused to take any part thereof, or to take any action to help the corporation, merely insisting on an independent audit of the corporation's affairs, though he had the fullest knowledge of its condition and finances. J. thereupon took and paid for all of the unissued stock. Thereafter an arrangement was made whereby the corporation was relieved of a contract and further losses thereunder were ended, and the corporation subsequently became prosperous. *Held*, that C., having been given a chance to take his proportion of the additional issue of stock on the same terms as J., could not have the stock issued to J. canceled, in order that he might be equally interested in the corporation with J.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 461; Dec. Dig. § 110.*]

Appeal from Special Term, New York County.

Action by Roland R. Conklin against the United Construction & Supply Company and others. From a judgment for defendants, entered upon a decision after a trial at Special Term, plaintiff appeals. Affirmed.

Argued before INGRAHAM, P. J., and LAUGHLIN, SCOTT, DOWLING, and HOTCHKISS, JJ.

Anson Beard, of New York City, for appellant.

Edward E. McCall, of New York City (Henry Wollman and William J. Patterson, both of New York City, on the brief), for respondents.

DOWLING, J. Appeal from a judgment dismissing the complaint on the merits, in an action wherein three separate actions were consolidated—the relief prayed for being: First, the cancellation as void of certain stock issued by the defendant corporation to the defendant Jarvis; second, an accounting between the defendant company and the plaintiff, and compelling the defendant Jarvis to repay to the company certain dividends paid to him; third, to impress a trust on certain moneys and securities paid by the company to Jarvis as a dividend.

Jarvis and Conklin originally became associated in business about 1880, in the West; Conklin (who was a bookkeeper) being then in

charge of the other's business. Thereafter they both interested themselves in the Jarvis & Conklin Mortgage & Trust Company, a corporation, whereof Jarvis was president and Conklin secretary; the latter having immediate charge of the bookkeeping and accounting end of its affairs, as he generally had in their subsequent associated enterprises. Later on they came to New York City and organized the North American Trust Company, whereof Jarvis was president and Conklin vice president. In July, 1888, Jarvis, who had resigned the presidency of the trust company in order that one Trenholm might be elected to the place, and who had become vice president instead (a similar position to that occupied by Conklin), was offered the fiscal agency of the United States in Cuba by the President of the United States, but asked that, instead, it be given to the company wherein he occupied an official position, which was done upon his promise to personally establish such agency there. At this time plaintiff was in Europe. Jarvis then established branches at Santiago and Havana to conduct the fiscal affairs of the government, and had business well started when plaintiff returned from abroad. Both the parties soon became well acquainted with the possibilities for business enterprises in Cuba, and Jarvis in particular was regarded as a person of great importance in the affairs of the island.

Louis Galban, who with his associates controlled the Red Telefonica de la Habana, whereof he was president, and which had a franchise for the construction and operation of the telephone system in Cuba, realizing that the term of the concession was about expiring, and fearing that he and his associates would not be able to secure an extension of the same—but which Jarvis, it was thought, would be more likely to obtain because of his official and financial connections—proposed to Jarvis the purchase of the stock of said company, which was finally accomplished; Jarvis and Conklin acquiring the same by funds obtained from the North American Trust Company on a note made by Alfred Williams, a bookkeeper in the employ of the trust company, the stock being deposited as collateral for the note. Thereafter, and to carry out the various phases of the telephone enterprise and its connected matters, corporations were organized under the laws of New Jersey and Delaware, having for their aim the furnishing of the means to construct and conduct the telephone business and a system of subways for wires to be connected therewith.

Among these corporations was the defendant United Construction & Supply Company, organized under the laws of the state of New Jersey. The corporation was organized about December 12, 1901, with an authorized capital stock of $2,000, consisting of 20 shares, of the par value of $100 each. This company took over the stock which Jarvis and Conklin had acquired in the Red Telefonica, they being reimbursed for all payments and advances in connection therewith. It also acquired the minority holdings in said company. The 20 shares of stock representing the original authorized issue of the Construction Company, and consisting of 18 shares to Jarvis and Conklin and 2 shares for qualifying directors, were paid for by Jarvis and Conklin. The 2 qualifying shares were at once indorsed in blank and delivered to Jarvis,

and the 18 shares were issued to Jarvis, as trustee for Jarvis and Conklin, who held them in such capacity until April 27, 1911, on which date he delivered up the certificates to the company and caused 10 shares thereof to be issued in his name and the other 10 shares in the name of Conklin, and claims to have delivered them to him the same day.

It is claimed the reason for the manner of issue of the stock originally was that it was not desirable that Conklin's name appear as a stockholder of record, in view of his position with other corporations. The anticipations of those interested were fulfilled, for a new concession was obtained, the details thereof having been arranged by one Capt. Talbott, who represented the parties in Cuba in conjunction with local counsel.   Thereafter the Construction Company made contracts by which it undertook to sell to the Cuban Telephone & Telegraph Company, a new corporation, certain telephone material and lines in consideration of the payment of $498,000 in stock and $500,000 in 6 per cent. first mortgage bonds of said Telephone Company, and with the same company for the building of a system of telephones in Havana, and for the sale to it of all the stock of the Red Telefonica, and to surrender the aforementioned $500,000 of bonds in consideration of the payment of $1,000,000 in 5 per cent. bonds, and $500,000 additional stock of said Telephone Company, making a total of $998,000 in stock to be issued to the Construction Company.   The latter contract was subsequently modified by a new contract, made August 9, 1906, with the Havana Telephone Company, a successor of the former Telephone Company, by which telephone systems were to be installed in Caiberien and Remedios in consideration of an additional $200,000 in stock and $200,000 in bonds of said Telephone Company to be paid to the Construction Company.   In December, 1906, pursuant to said contract, the Havana Telephone Company issued and delivered to the Construction Company stock of the par value of $1,198,000 and bonds to the amount of $1,200,000, being the total amount contracted to be paid to the Construction Company.   Of these bonds, certain amounts were sold to London bankers.

A contract had also been made between the Construction Company and the Havana Subway Company, by which a subway system for wires was to be built in Havana in consideration of the payment of $500,000 of 6 per cent. bonds and $250,000 of stock in the Subway Company, which securities were thereafter duly delivered to the company.   Later on, in May, 1908, the Subway Company issued to the Construction Company its note for $129,000, having previously given its note for $200,000, secured by a mortgage on its real estate.   In 1908 the Construction Company had also issued and delivered to Jarvis and Conklin its promissory note for $433,016.63, covering all the amounts loaned and expended by them to or for the Construction Company or the Subway Company, or on account of the building of the subway, or expended by them in any way on that account.   Thereafter, and in 1909, the Construction Company delivered to them its promissory notes, aggregating $590,000, which included the indebtedness represented by the first-mentioned note, and the larger amount included all advances, loans, and expenditures on account of the Telephone Compan-

ies, the Subway Company, or the Construction Company, or expended in any way for their benefit. Thereafter they loaned the Construction Company, up to October 8, 1909, the sum of $27,764.50, and were given certain bonds of the Telephone Company as collateral security therefor. All the advances, loans, and expenditures made by Jarvis and Conklin, and all indebtedness due to them, were paid in full, with interest, after January 1, 1910.

Meanwhile the franchise of the Telephone Company had been declared to be void by the highest court in Cuba, and the Construction Company was compelled to redeem certain bonds that had been sold in England. In 1908 there was a probability of a new law being enacted in Cuba which would make it possible to build and operate telephone systems, whereupon the Cuban Telephone Company was incorporated by Jarvis and Conklin under the laws of the state of Delaware, and in October, 1909, it entered into a contract with the Construction Company by which the latter agreed, in return for bonds of the Telephone Company, to transfer to it the bonds and stock of the original Telephone Company, and the bonds, notes, and stock of the Subway Company, and to build a telephone system, not only in Havana, but in other parts of Cuba as well. Construction was begun under this contract, but there is evidence that the estimates had been made too low, as the result of which the Construction Company was facing disaster. By December 21, 1909, the capital stock of the Construction Company had been increased to $100,000. Of this but $2,000 had been actually paid for and issued. Various representations had been made by the parties interested, leading the public to believe that the whole amount of $100,-000 had been fully paid in. This created a situation where it was evident that there was a belief in some quarters among those concerned that the representations had come dangerously near the line of criminal responsibility. In any event, great uneasiness was manifested over the fact that the remaining $98,000 of stock had not been issued and paid up. Some worthless stock in two corporations, one of which was in the hands of a liquidator, had been placed in the hands of the treasurer of the company, by him inclosed in an envelope, and deposited in the safe of the company; it thus being sought to justify the representations that all the stock had actually been issued and paid for, although no one interested in the company regarded it as such, and no stock was in fact issued.

Meantime Jarvis and Conklin had both been concerned about their individual ventures, for each was engaged in enterprises in which the other had no interest. The condition of the Construction Company had grown so unsatisfactory, and its financial position was so insecure, that on March 21, 1911, at a meeting of the directors of the Construction Company, a resolution was passed authorizing the officers of the company to sell and issue to Jarvis and Conklin, or to either of them, or to their nominees, certificates for full-paid shares, of the aggregate amount of $98,000 par value, upon payment or delivery to the company of, first, bonds of the Cuban Telephone Company to the aggregate amount of $30,500, to be received at par; and, second, cash to the amount of $67,500. This resolution, if made effective, would have

made the whole issue of the stock of the company fully paid up, and carried out in fact the false representations theretofore made as to the situation with regard to the remaining $98,000 of the stock.   This resolution also gave to the two parties, Jarvis and Conklin, who were the owners of the $2,000 of stock, the right to take between them the entire balance of the capital stock, and, if complied with by Jarvis and Conklin, would have still left them equal owners of the stock of the Construction Company.   Conklin was about to sail for Europe on the next day, and Jarvis made numerous efforts to see him before he finally succeeded in doing so.   The latter asked Conklin what he was going to do about paying for the stock he wanted to take, and turning the consideration into the company, to which Conklin replied that he could not pay anything then, that he had obligations to the Royal Bank of Canada, the National Bank of Cuba, to one Tarafa, and others, and was absolutely unable to make the payments.   Jarvis called his attention to the condition that the company was in, its great need of money, and the statements that had been made at various times as to the whole issue of stock having been paid up, and urged that Conklin take up at least part of the capital stock and have the matter disposed of before he left for Europe.   This interview consisted of a series of insistences on the part of Jarvis that the money should be paid in and the stock actually paid for before any trouble arose for the company, and the failure of Conklin to agree to do this or to make any offer to pay in cash or its equivalent for any part of the unissued stock.   There had been prior talks between them, at which Jarvis had insisted on the necessity of the stock being fully paid for, and it is apparent that this insistence was due, not only to the financial straits of the Construction Company, but also to the responsibility that had been assumed by reason of the prior representations that the stock had all been issued and was full paid.

Jarvis insisted at this final meeting on March 21st that the stock must be really paid up in cash or in tangible securities that would bear the closest inspection.   Conklin went to Europe the next day without having done anything about paying for his share of the stock, and Jarvis went on a trip to Cuba and San Domingo, returning in April.   Upon his return he found that Conklin had not yet done anything about paying for the stock, and as it was claimed that the company was then in immediate need of cash, he (Jarvis) on April 27, 1911, paid to the company $10,000 in cash and received stock to that amount in exchange. The treasurer of the Construction Company said that this amount would help out temporarily, but that it was important that the whole issue of stock be paid for as soon as possible.   Conklin still had evinced no desire to pay for any stock.   On May 1, 1911, the board of directors of the Construction Company met and passed a resolution reciting the failure to carry out the terms for the purchase of the remaining stock in the treasury, as authorized by the resolution of March 21, 1911, revoked the authority given thereunder, and authorized the sale to Jarvis or to his nominee of $10,000 par value of the stock.   This was the amount of stock theretofore bought by Jarvis, and was a ratification of his purchase thereof.   Conklin returned from Europe in May, and the

treasurer of the company called upon him and told him that, as he knew, Jarvis had subscribed $10,000 for 100 shares in the Construction Company, and wanted to know if he would do the same, as the company needed funds, whereupon Conklin replied that he would not do so. The treasurer then asked him if he would carry out his agreement to put in cash and Cuban Telephone Company bonds for the balance of the capital stock of the Construction Company, and again he said that he would not do so.

As soon as the treasurer had left, Conklin called up Jarvis and told him of the treasurer's visit and the request that he pay up for his share of the stock in the Construction Company, and said that he would not do it, that he did not intend to pay up for any stock in the Construction Company, but that what he wanted was that there should be an independent audit of the company's affairs right away. Jarvis replied that the treasurer had called upon him in his official capacity, that it was of the utmost importance that all of the money for the full issue of stock be paid in at once, that the company needed money, that it had obligations to meet and was pressed therefor, and he also referred to the prior statements made in regard to the stock having been all issued and paid for. Conklin thereafter called on Jarvis and said he wanted an independent audit of the Construction Company, to which Jarvis replied that what he wanted was to pay up the balance of the capital stock of the company in order to meet its obligations and keep faith with everybody, that it was the first thing to do, that the books and papers of the company were open to Conklin at any time, that he had the management of the finances of the company, that the books and everything else were there for his inspection, but the capital stock must be paid up. At this interview there was a discussion as to the nature and particulars of the pressing financial obligations of the Construction Company. At that time Conklin said he would not indorse any more notes of the company, nor be responsible for any of its obligations, as he needed all the money he could get hold of to meet his own obligations. Whenever a suggestion was made that money was paid in or its equivalent be contributed by Conklin to take up his share of the unissued stock of the Construction Company, he failed either to do it or agree to do it, but always talked about the necessity of an independent audit of the company's affairs.

Finally, on September 11, 1911, he was notified in writing that at a meeting held by the directors of the Construction Company on September 9, 1911, they had resolved that the unissued portion of the company's stock be offered for sale at par, and the officers of the company were thereby authorized to accept subscriptions for such stock, the present stockholders to have first opportunity of subscribing for it in the relative proportion of their present holdings, and that such stock remained open for such subscription up to September 20, 1911, at the company's offices. On September 19th Conklin was notified that a meeting would be held at the company's offices on September 21st at 10 o'clock to discuss its financial affairs. Meantime, on September 19, 1911, Conklin had written to Jarvis, as president of the Construction Company, a letter which is the best evidence that, despite the op-

portunity which had been given him on March 21, 1911, to take his half of the remaining $98,000 of the issue of the Construction Company at par on terms of equality with Jarvis, he not only did not avail himself of the opportunity itself, but even as late as the date mentioned still took the same attitude and refused to accept the opportunity to avail himself of the offered right to subscribe for one-half of the remaining stock, and thus by paying for it at par in cash and bonds, or in cash alone, leave himself still an equal owner with Jarvis of all the stock of the company.  That letter shows that he never up to that time agreed to take his share of the $98,000, and that he did not then agree to take such share.  On the contrary, it shows that he had as yet reached no conclusion as to whether he desired to subscribe for his portion of the stock or not.  This letter is significant, also, as showing that he did not then regard, and never had regarded, the remaining $98,000 of stock as issued, but treated the deposit of the worthless securities as against the unissued stock as simply a pretext for the claim that the stock had been all issued.  It is unnecessary to further characterize this letter than to say that it demonstrates the plaintiff's unwillingness to commit himself to the purchase of the stock and his failure to avail himself of the opportunity which had been tendered to him to acquire it.  Neither is it necessary to go into the subsequent conferences, negotiations, and disputes between the parties, none of which changed the situation or modified Conklin's refusal to take the stock.

On September 21, 1911, a meeting of the directors of the Construction Company was held, which Conklin attended.  There was great emphasis laid on the need for money by the Construction Company and on the untruthful representations that had been made that the stock had been full paid; but Conklin did not agree or suggest that he would agree to take his share of the stock under any circumstances.  Instead of that, he suggested that a dividend be declared and that such dividend be used to pay up the capital stock.  The reply to that was that the company was in no condition to pay a dividend, and its liability was so large that it was impossible to do it.  Conklin then suggested that a bookkeeping entry be made paying for the stock with the material on hand purchased by the Construction Company, whereupon it was shown that the material on hand was unpaid for, and it represented an actual liability.  At this meeting Jarvis, when he urged upon Conklin the necessity of paying in all the capital, was met by Conklin's declination to even make a suggestion, promise, or intimation that he would pay his share then or at any future time; his sole reply being that what he wanted was an independent audit of the company.  When Conklin referred to the fact that Jarvis had bought $10,000 of the capital stock, he was told by Jarvis that he had had the opportunity all the time to subscribe for his share, that it had been urged upon him, and that he had the chance to do it now; all he had to do was to pay the money and have the stock issued to him.  Jarvis then not only asked but urged upon Conklin that he should take his share of the stock, and asked him if he would take his half of the whole $98,000 of the stock and pay for it, to which Conklin replied that he would not take it.

The meeting of the directors having resulted in nothing save Conklin's insistence upon an audit, and his suggestion that in some way a dividend be declared, so that in that manner the stock might be issued and regarded as fully paid for, the directors adjourned the meeting until the next day. By this time it was apparent that Conklin did not propose to contribute a dollar to the company, nor do a thing to make its stock full paid, and had no intention to pay in any way for any share of the unissued stock. So, on that day, September 22d, the directors passed a resolution authorizing the sale of the remaining treasury stock, $88,000, to Jarvis in exchange for 1,661 shares of Cuban Telephone stock at the rate of $53 a share, and the sale of the stock was consummated on these terms. Conklin protested against this action, but still made no offer to take any share of the stock. This left Conklin with $1,000 of the capital stock of the Construction Company, and Jarvis with the remaining $99,000. It is quite apparent that Conklin's whole course throughout 1911 had been one of flat refusal to risk any more on the Construction Company's account, to leave Jarvis to handle it as best he could, and, having refused to contribute money at the risk of the enterprise, to place upon Jarvis the responsibility of either contributing the money or seeing the whole venture fail.

But a change in the tide of affairs of the company occurred when Jarvis, who now owns 99 per cent. of the Construction Company stock, succeeded in making an arrangement with the Cuban Telephone Company by which the Construction Company was relieved from its contract. Further losses thereunder ended, and it was reimbursed all it had expended upon the construction work, with a commission of 15 per cent. thereon; the Telephone Company assuming all the obligations for construction of the Construction Company, and delivering its promissory notes to the Construction Company to the amount of $664,000. After this setlement had been made, Jarvis and Conklin were repaid the entire indebtedness still owing to them from the Construction Company, and, there being a balance on hand on May 10, 1912, after these payments were made, of over $1,300,000, consisting principally of notes and securities received under the settlement, with some cash, it declared a dividend of $750 a share and drew its checks therefor. This dividend was declared upon the basis of the then holdings in the Construction Company, namely, Conklin $1,000, and Jarvis $99,000. Conklin by this action seeks to set aside the issue of the additional shares of stock to Jarvis. After his letter of September 19, 1911, which discloses his unwillingness to subscribe for any share of the stock, and insistence on an audit (the necessity for which is not shown, since he had the fullest knowledge of the company's condition and finances), he has advanced other theories which he claims relieved him from the necessity of subscribing for and taking any share of the stock.

[1-3] These theories are: First. That the entire issue of $100,000 was full paid, the remaining $98,000 having been paid for by the worthless stock deposited with the treasurer of the corporation, for which in fact no shares of stock were ever issued in return. For this contention there is not the slightest foundation, and every act of Conklin demonstrates its futility. Second. That all the corporate entities,

by means of which the various operations in Cuba were conducted, should be disregarded, and the entire venture there treated as a joint enterprise of Jarvis and Conklin, and their rights determined as participants in such joint venture, and not as stockholders in a corporation. This contention we believe to be without merit. Third. He also claimed at one time, after September 19th, that he was entitled to one-half of the $10,000 of stock which Jarvis had bought; but he never offered to pay for that in cash or in any other way. Fourth. He claims that, as owner of one-half of the original issue of stock, he was entitled to one-half of the balance remaining unissued; that he had demanded the right to take the same, and that it had been refused him. On the contrary, this record overwhelmingly demonstrates that the opportunity was given him to take one-half of the $98,000 about to be issued upon precisely the same terms as Jarvis was offered the opportunity so to do; but he persistently, continuously, and steadfastly refused to avail himself of the opportunity, and met every demand that he should do so with an unequivocal refusal. He was entitled to an opportunity of subscribing for one-half of the additional issue of the $98,000 issue, but that right he was compelled to exercise within a reasonable time. Not only did he fail to exercise the right, but he disavowed his intention of profiting by the opportunity in the most unmistakable terms.

We deem it unnecessary to discuss any other issues raised in this case, considering the foregoing conclusive of the result. Every right that the plaintiff had under the doctrine laid down in Stokes v. Continental Trust Co., 186 N. Y. 285, 78 N. E. 1090, 12 L. R. A. (N. S.) 969, 9 Ann. Cas. 738, was afforded him, and a stockholder cannot complain if, after having been given a chance to get his proportion of an additional issue of stock on the same terms as others interested, he is unwilling to risk more money in the venture, and prefers to let the others interested take their chances on ultimate success. Plaintiff may have exercised good business judgment in not availing himself of his chance to buy his share of these stocks at the time it was offered to him. It was not until the fortunate settlement with the Telephone Company, in May, 1912, made the Construction Company a source of great wealth, that he regretted his decision. For such mistakes in judgment the courts can offer no relief. The language used in Dusenberry v. Sagamore Development Co., 150 N. Y. Supp. 229, is applicable to the present case:

"This complaint is not of an opportunity denied, but rather of an opportunity overlooked, and the grievance does not seem to arise over a lost investment, but rather over the power of control over the corporation gained by others more vigilant."

The judgment appealed from will be affirmed, with costs. All concur.