SEAMAN v. IRONWOOD AMUSEMENT CORP.

1. CORPORATIONS — STOCKHOLDERS' MEETINGS — RESOLUTIONS — AMENDING ARTICLES—MAJORITY—VOTE BY PLEDGEE—ESTOPPEL.

Resolution amending articles of incorporation at meeting of stockholders, which authorized sale to them of no par stock at $1 per share and giving such stock equal rights as to dividends, voting, and distribution upon liquidation with the outstanding stock which had a par value of $100 per share, book value of $112.43, and which had been purchased at public auction at $2.50, *held*, not invalid because some stock had been voted in favor thereof by pledgee where owner was present at the meeting, made no complaint thereat and sufficient stock to pass the resolution by a two-thirds majority had been voted in favor of passage of the resolution even though pledged stock had been voted against it.

2. SAME—STOCKHOLDERS' MEETINGS—RESOLUTIONS—AMENDING ARTICLES—VOTE BY RECEIVER.

Vote by receiver of bank in favor of resolution amending articles of incorporation at meeting of stockholders, which authorized sale to them of no par stock at $1 per share and giving such stock equal rights as to dividends, voting, and distribution upon liquidation with the outstanding stock which had a par value of $100 per share, book value of $112.43, and which had been purchased at public auction at $2.50, *held*, proper in suit by a stockholder brought some time later, where fact that such voter, as receiver of the bank, was the owner of the stock was evidenced by stock record of the corporation and the record in the case and no challenge of his right to vote either was or could be made.

3. SAME—AMENDING ARTICLES—INCREASE OF STOCK—ISSUANCE OF SHARES WITHOUT PAR VALUE—FRAUD.

In a stockholder's suit against corporation and certain other stockholders to require corporation to reimburse such stock-

holders as had purchased no par stock issued pursuant to resolution amending articles of incorporation, which had been passed by holders of a majority of upwards of two-thirds of the outstanding stock, whereby sale to stockholders of the no par stock was authorized at $1 per share and it was given equal rights as to dividends, voting, and distribution upon liquidation with the then outstanding stock which had a par value of $100 per share, book value of $112.43, and which had been purchased at public auction at $2.50, action of stockholders in so amending articles in order to raise capital for corporation in straitened financial circumstances *held*, without fraud, either actual or constructive under record presented.

4. SAME—STOCKHOLDERS' MEETING—AMENDMENT OF ARTICLES—SHARES WITHOUT PAR VALUE—MAJORITY—STATUTES.

Statutory requirement that holders of two-thirds of the total number of shares of each class of stock outstanding and entitled to vote on matter of issuance or subscription to shares without par value fix consideration at which such stock was to be issued *held*, inapplicable to resolution, passed at stockholders' meeting, to amend articles of incorporation so as to permit issuance of such stock, authority to amend articles without limitation so long as articles as amended would have been authorized by statute as original articles being conferred upon holders of a mere majority of shares entitled to vote (Act No. 327, §§ 19, 43, Pub. Acts 1931).

5. SAME—PROXIES—CONSTRUCTIVE NOTICE TO STOCKHOLDER.

A shareholder represented by proxy at a meeting is chargeable with knowledge of facts connected with the proceedings of that meeting, known to his proxy.

6. SAME—OFFER OF NEWLY-AUTHORIZED STOCK TO STOCKHOLDERS—ESTOPPEL—CHANGE OF OFFER—RECORD.

In stockholder's suit against corporation and certain other stockholders who purchased shares of newly-authorized stock without par value, plaintiff's claim that such stock should be surrendered to corporation which in turn should be required to reimburse purchasers the amount it had received therefor because offer of the corporation to its stockholders had been changed by action of the board of directors which amounted to a preferential offer *held*, untenable where plaintiff, through his brother as proxy, knew of action of stockholders and directors but disdained participation in efforts of others to reorganize and rebuild the corporation when it was facing

bankruptcy and record does not disclose any action was ever taken at a stockholders' or directors' meeting changing the offer by cancellation of balance due from stockholders on their original subscriptions to the newly-authorized stock.

7. SAME—NO PAR STOCK—PRE-EMPTION BY STOCKHOLDER—RECORD—LACHES—WAIVER—FRAUD.

Plaintiff, a stockholder in defendant corporation which was empowered by proper corporate and governmental authorities to issue to stockholders for $1 per share, stock without par value with equal rights as to dividends, voting, and distribution upon liquidation with the outstanding stock which had a par value of $100 per share, book value of $112.43, and which had been purchased at public auction at $2.50, *held*, by waiting for over two years thereafter, when corporation had emerged from financial straits, guilty of laches and to have waived his right to *pro rata* share of no par stock or to equitable relief where record shows he or his proxy had full opportunity to pre-empt shares, his proxy was present at trial but did not testify, no intentional wrong to plaintiff is claimed nor was there an act of fraud perpetrated by the corporation or any of its officers.

8. SAME—ACTION BY MINORITY STOCKHOLDER—FRAUD—ULTRA VIRES ACTS—LACHES AS DEFENSE.

Laches is a defense to the action of a minority stockholder to set aside corporate acts whether fraudulent or *ultra vires.*

Appeal from Gogebic; Driscoll (George O.), J. Submitted January 13, 1938. (Docket No. 43, Calendar No. 39,799.) Decided February 24, 1938.

Bill by Meyer J. Seaman against Ironwood Amusement · Corporation, a Michigan corporation, and others to require the corporation defendant to reimburse other defendants for purchase price of stock, for cancellation of that stock, and for injunction. Bill dismissed. Plaintiff appeals. Affirmed.

*Rosenburg & Painter* and *Humphrey & Humphrey,* for plaintiff.

*Edward W. Massie (Raymond Turner* and *Miller, Canfield, Paddock & Stone,* of counsel), for defendants.

CHANDLER, J.   The Ironwood Amusement Corporation was originally organized on the 21st day of November, 1918, under the laws of the State of Michigan for the purpose of operating theaters in the city of Ironwood.  The original capital stock of this corporation was $10,000.  Certain amendments were made to the articles of incorporation increasing the capital stock so, as of October, 1932, the corporation had an authorized capital stock of 1,500 shares of the par value of $100 per share, 1,400 shares of which were fully paid, issued and outstanding, the remaining 100 shares being retained in the treasury.

The plaintiff, Meyer J. Seaman, was the owner of 250 shares of this stock.  A brother of the plaintiff was also the owner of stock in the corporation and resided at Ironwood.  Mr. Charles Seaman, plaintiff, and A. L. Picker were the original incorporators of the corporation.  The plaintiff lived at Ashland, Wisconsin, where he engaged in business, and his brother and Mr. Picker, residing in Ironwood, had charge of the affairs of the corporation.  Charles Seaman continued as a member of the board of directors until the year 1934.  The individuals here referred to were also the principal owners of stock in the Seaman Building Corporation, which owned property adjoining one of the theaters of the Ironwood Amusement Corporation, and the last-named corporation for a number of years rented a portion of the building owned by the Seaman Building Corporation for the purpose of a lobby for the theater. In 1931 and 1932 the Ironwood Amusement Corpo-

ration had felt the effects of the industrial depression and its receipts had decreased to the extent that the corporation was sustaining serious losses. For the year ending June 30, 1933, the corporation had sustained a net loss of upwards of $19,000, and had also sustained a loss for the fiscal year ending June 30, 1932. As of August 7, 1932, its balance sheet showed current assets of $113.91 and current liabilities of $47,850, consisting for the most part of indebtedness to banks, delinquent taxes, rent and interest. Its fixed liabilities consisted of a first mortgage of $74,000. The fixed assets, land, buildings, equipment and improvements, were carried on the books at $247,364.89.

This statement would indicate the book value of the stock to be $112 per share; however, the record shows that during the fall of the year 1932 certain shares of the stock were sold at public auction for approximately $2.50 per share.

Threats of bankruptcy faced the corporation and conferences were held by certain of the stockholders, including the brother of plaintiff, at which receivership proceedings were discussed and later committees were appointed to negotiate with the bondholders for an extension of time and to negotiate with the banks and other creditors for a compromise of the corporation's indebtedness. These negotiations finally resulted in an extension of time being granted by the bondholders, the banks waiving interest, and compromises with other creditors on the basis of 50 cents on the dollar.

Being confronted with these propositions, it can be readily seen that the prospects were far from bright. The stock had but little, if any, real value and the problems confronting the management were very involved. At a meeting of the board of di-

rectors held on July 21, 1932, the president advised the board of receipt of a notice to vacate dated July 13, 1932, which had been served upon him by the Seaman Building Corporation for nonpayment of lobby rental in the sum of $1,727.44. At this meeting, Mr. Charles Seaman, president of the Seaman Building Corporation, gave to the Ironwood Amusement Corporation an extension of time for the payment of the rent until August 25, 1932. At a special meeting of the stockholders of the Ironwood Amusement Corporation held August 29, 1932, at which plaintiff's brother, Charles Seaman, was present, ways and means of securing additional capital were discussed and it was suggested at this meeting that the capital stock be increased to make available stock for sale in order to obtain additional capital. "It was determined that it was for the best interests of the corporation the capital stock be increased in order to make available stock for sale." At a special meeting of the stockholders held September 8, 1932, another notice to quit for nonpayment of lobby rental, served by the Seaman Building Corporation on August 22, 1932, was brought to the attention of the stockholders, and the following appears with reference thereto in the minutes of this meeting:

"The matter demanding immediate attention, those present advanced sufficient moneys to pay the amount of rental in default."

At another special meeting of the stockholders held September 12, 1932, at which Charles Seaman was present, further discussion was had on the financial condition of the company; ways and means of securing additional capital to meet the current obligations were also discussed; and the matter of changing the capital stock from par value into no

par value stock, and to increase the number of shares of stock and selling part of the proposed increase to stockholders of record, were considered.

On October 3, 1932, a special meeting of the board of directors of the corporation was held pursuant to written notice duly given and it was then and there resolved, to call a special meeting of the stockholders and submit to them the proposition of changing the 1,500 shares common capital stock of the par value of $100 each into common stock without nominal or par value, and that the capital stock of the corporation be increased to 30,000 shares of common stock of no par value; that 10,000 shares of the newly-authorized capital of no par value be offered the stockholders of record for their subscription at a price of $1 per share, each such stockholder to be entitled to subscribe for an amount thereof equal to seven and one seventh shares for each share of stock then held by him, said subscriptions to be paid in cash for the amount subscribed as follows: 30 per cent. on or before November 17, 1932; 30 per cent. on or before December 17, 1932; 20 per cent. on or before January 17, 1933, and the balance on or before February 17, 1933. It was also resolved that in the event any stockholder of record should fail to subscribe for the whole or any part of his proportionate share on or before November 1, 1932, that the board of directors should have power and authority to dispose of the same to other stockholders for cash at a price to be determined by them but for not less than $1 per share; and, that each stockholder be given a reasonable opportunity to subscribe for his proportionate share. This resolution further provided that any unissued shares of capital stock without par value might be issued and sold by the company in such manner and for such consideration as

from time to time might be fixed by the board of directors at not less than $1 per share. A special meeting of the stockholders was called to be held on the 17th of October, 1932, for the purpose of submitting the proposed amendments, and the secretary was instructed to send out notices to the stockholders of said company pursuant to the resolution with a letter to all out-of-town stockholders explaining in greater detail the reasons and necessity for the proposed amendments. The plaintiff received this notice together with a letter explaining in detail the reasons and necessity for the increase of the capital stock.

Pursuant to this notice a meeting was held October 17, 1932, at which meeting all of the outstanding capital stock was represented either in person by the shareholders thereof or by proxy. Plaintiff was represented by his brother, Charles Seaman, who was present in person at this meeting. A resolution was offered changing the 1,500 shares of common capital stock of the par value of $100 each into common stock without nominal or par value, and this resolution received the affirmative vote of 1,075 shares and no contrary vote was recorded, the record showing that the stock owned by plaintiff and his brother, Charles Seaman, was present but not voted. A resolution was then presented providing that the capital stock of the company be increased to 30,000 shares of common stock of no par value which received the affirmative vote of 1,075 shares, the plaintiff being represented by his proxy, Charles Seaman, who was personally present, but the Seaman stock was not voted. A resolution was then presented providing for the offering for sale of 10,000 shares of the newly-authorized capital stock of no par value to stockholders of record as of 12

o'clock noon October 17, 1932, for subscription at a price of $1 per share, each such stockholder being entitled to subscribe at said price an amount thereof equal to seven and one-seventh shares for each share then held by him. This resolution was adopted by a similar vote. Another resolution, similarly adopted, authorized the sale of the stock by the company.

Later, on the 26th of October, 1932, the vice-president and secretary of the Ironwood Amusement Corporation filed with the secretary of State a certificate of amendment to the articles of incorporation of said company. The following was placed in the certificate subsequent to the stockholders' meeting at the time it was presented to the secretary of State for filing, the same being placed therein at the insistence of the latter for the purpose of ascertaining and determining the franchise fee payable to him under Act No. 85, §§ 3, 3a, Pub. Acts 1921, as amended (2 Comp. Laws 1929, §§ 10138, 10139), and for no other purpose:

"Consisting of 1,500 shares of Class A stock and 28,500 shares Class B stock. The book value of Class A stock is $112.43 per share and Class B stock, $1 per share."

On November 16, 1932, an order was entered by the Michigan securities commission approving of the amended articles and authorizing the sale of 10,000 shares of unissued no par stock at the price of $1 per share for sale to stockholders only under the provisions of 3 Comp. Laws 1929, § 9773(d).

A special meeting of stockholders was held November 26, 1932, at which meeting plaintiff's brother, Charles Seaman, was present, it being decided to pay in 30 per cent. of the subscriptions for $10,000 of the stock, and Charles Seaman, with two others, was appointed to make an appraisal of the build-

ings and equipment of the corporation for the purpose of writing down assets in order that a saving might be made in the capital stock tax. The resolutions adopted at this meeting were unanimously carried. A regular annual meeting of the stockholders was held January 9, 1933, there being present shareholders representing all of the stock, Charles Seaman being present in person and as proxy for plaintiff. At this meeting plaintiff's brother was re-elected as a director of the corporation. At a special meeting of the board of directors held January 13, 1933, at which plaintiff's brother was present, a resolution was adopted changing the time of payment of subscriptions for capital stock to the extent that the first payment should be made on or before February 1st in order to give those who were in default an opportunity to come in on a *pro rata* basis, and that subsequent payment of 70 per cent. be left to the discretion of the board of directors, but that in no case should the board of directors call for more than 30 per cent. at intervals of not less than 30 days. This resolution was unanimously adopted by the board of directors, and all stockholders were given notice of the same.

Another special meeting of the board of directors was held on the 15th of March, 1933, at which plaintiff's brother was present, and a notice to stockholders was authorized advising them that there were 942½ shares of the authorized increase available for subscription because four of the original stockholders had not subscribed for their share, and that stockholders in the corporation were entitled to subscribe for their *pro rata* share of this 942½ shares at $1 per share and had 10 days in which to do so, and that otherwise this stock might be then taken as a payment by the 10 stockholders of record who made a loan to the corporation in the sum of

$100 each. This notice was sent by registered mail to all of the stockholders, including plaintiff.

Plaintiff's proxy, Charles Seaman, was present at a meeting of the stockholders, November 26, 1932, when it was decided to pay in 30 per cent. of the subscriptions for $10,000 worth of stock. At that same meeting Charles Seaman supported a motion that stock certificates and revenue stamps be purchased for the issue of new certificates. He was also present at a meeting of the board of directors when a resolution was passed authorizing the secretary to call in the old stock and issue the new.

A directors' meeting was held on June 28, 1933, at which Charles Seaman was present, and at that time an adjustment of the assets of the company was made to comply with the values of the company as set up by its auditors. Between this date and June 13, 1934, no material progress had been made by the corporation and it was evidently deemed advisable by both the board of directors and the stockholders that some attempt should be made to put the business under experienced management. A proposition had been made by Mr. Martin D. Thomas, one of the defendants herein, that he would undertake the management of the company for a period of five years, the company to pay him $25 per week during said period, and if at the end of five years all the liabilities of the company, both current and fixed, had been paid from the operation of the business, he should receive, in addition to his salary, shares of stock in the corporation equal to one-fifteenth of the issued stock thereof.

A special meeting of the stockholders was held on June 13, 1934, pursuant to notice, including a notice to plaintiff, for the discussion and consideration of the proposed agreement with Mr. Thomas. At this

meeting the plaintiff's brother, Charles Seaman, was present in person and as proxy of the plaintiff, and upon motion of Charles Seaman the proposed contract with Mr. Thomas was unanimously adopted, the stock of plaintiff being voted in favor thereof.

On January 28, 1935, the annual meeting of the stockholders of the corporation was held, at which plaintiff was represented by his attorney, Charles Humphrey, who held his proxy. The business conducted at this meeting was the election of a board of directors. A meeting of the board of directors was held directly thereafter. The minutes of this meeting show that Mr. Humphrey, attorney for Mr. Charles Seaman and Meyer Seaman, was present, as was also Charles Seaman in person, and that an informal discussion was held in regard to stock and matters pertaining to the rental of the lobby from the Seaman Building Corporation. It appears that other meetings of the stockholders were held as late as December 3, 1935, at which Mr. Charles Seaman was present in person and plaintiff was represented by his attorney, Mr. Humphrey.

It may seem that the activities of plaintiff's brother, Charles Seaman, are given undue prominence in this opinion, but attention is called to these numerous meetings at which Charles Seaman was present, at which times he represented plaintiff, because of the relations between Charles and Meyer Seaman which we will now discuss.

It appears from the testimony of the plaintiff that he never personally attended any stockholders' meeting of the Ironwood Amusement Corporation or any meeting of the Seaman Building Corporation, and that because of his absence from the city of Ironwood, being engaged in business elsewhere, the matter of his holdings in these corporations was left

entirely to his brother, Charles Seaman. Plaintiff testified: "The theater business was left entirely in the hands of my brother, Charles, and A. L. Picker. I relied upon them to manage my affairs and look after my interest during that period, 1922 to 1928." During this time plaintiff resided in Ashland, Wisconsin. Later he went to Battle Creek. He testified:

"*Q.* When you were in Battle Creek the situation didn't change, Charles continued to look after your interests in the Ironwood Theatre?

"*A.* I didn't tell him to look after it; the thing just went on * * * Charlie looked after those things; I never attended one meeting of the stockholders or directors of the Seaman Building Corporation or Ironwood Amusement Corporation. I was merely represented by Charles or someone else * * * he took care of my theater stock in the business. I never appeared at a stockholders' meeting in its whole history, except by proxy. I let Charles vote my proxy."

All of the stockholders but four subscribed for their proportionate share of the 10,000 shares of stock authorized to be sold and paid 30 per cent. of the amount subscribed. No further sums were ever paid by them, and no call was made upon them for further payment by the board of directors. The record of the corporation does not disclose that any other or further action was taken either by the stockholders or the directors relative to the sale of other stock or the collection of unpaid subscriptions on the stock subscribed. The stock record at the time of the hearing of this case showed that between July 24, 1933, and February 4, 1936, upon the surrender of old certificates new stock certificates for a like number of shares were issued to all stockholders except-

ing plaintiff, his brother and one other who did not surrender his stock. This was called Class A stock on the stock record. All of the new certificates but seven bear date of July 24, 1933, one certificate bearing date August 11, 1933, two, February 10, 1934, one May 9, 1934, two November 15, 1935, and one February 4, 1936. What is termed the Class B stock record shows that 2,996½ shares of stock were issued between the dates of July 24, 1933, and May 9, 1934, inclusive.

At the time of the hearing of this cause in the court below it appeared that under the management of Mr. Thomas the bonded indebtedness of the corporation had been reduced to approximately $32,000 and the current liabilities to $2,200, and upon argument before this court it was stated by counsel for the appellees, and not contradicted by appellant, that all of the indebtedness of the corporation, both fixed and current, had been paid in full.

On June 2, 1936, plaintiff filed his bill of complaint charging that the action of the stockholders of the corporation in amending its articles of incorporation was illegal and fraudulent in that the financial condition of the corporation did not require the issuance and sale of further stock in said corporation; that plaintiff and other stockholders were deprived of their just proportion of the capital stock of the corporation by reason of plaintiff's inability to subscribe for and pay for his proportionate share thereof; that by the issuance of said stock the purchasers thereof had acquired rights and benefits from said stock out of proportion to the stockholders who were unable to subscribe and pay therefor; that the action of said corporation was illegal and void for the reason that in the vote taken for the amendment of the articles of incorporation

authorizing the sale it was not voted by the holders of record of two-thirds of the capital stock then outstanding, inasmuch as defendant Alex Rosemurgy voted 100 shares of stock which were then of record in the name of Charles Seaman, and Daniel Waite, as receiver of the Iron National Bank, voted 75 shares of stock which were then of record in the name of Charles Seaman and 50 shares of stock which were then of record in the name of A. L. Picker; and, that the issuance of the new certificates was illegal and fraudulent for the reason that the president and secretary of the corporation were not authorized by the stockholders or the board of directors to issue the same. Plaintiff by his bill asks that the corporation be required to reimburse the holders of the so-called Class B stock for the respective amounts paid by them upon receiving said certificates and that said holders of said stock be required to surrender their certificates to the corporation for cancellation. It is here to be noted that no rights of creditors are involved, and that this is a suit brought by a stockholder challenging the action taken by the directors and other stockholders in the name of the corporation.

The trial court found that plaintiff had presented no case for equitable relief and entered a decree dismissing his bill of complaint. From this decree plaintiff appeals and insists that said decree should be vacated and relief granted for the following reasons:

1-2. That the resolution passed by the stockholders authorizing the sale of 10,000 shares of no par value stock at $1 per share, giving such stock equal dividend rights, equal voting rights and rights of equal distribution upon liquidation with the outstanding stock which had a par value of $100 per

share and a book value of $112.43, and which had been purchased at public auction at $2.50 per share, was illegal, void and fraudulent. Also that it was void because not adopted by a two-thirds vote of the stockholders.

The records of the corporation show that at the time the vote was taken for amendment of the articles of incorporation, one Alex Rosemurgy had standing in his name on the books of the corporation 139 shares and "Alex Rosemurgy, pledgee, 100 shares." This stock was voted in favor of the resolution. If this 100 shares standing in the name of Rosemurgy, as pledgee, had not voted at all, or had voted in the negative, the resolution would still have had more than a two-thirds vote of all the stock outstanding. The record discloses that a portion of this stock standing in the name of Alex Rosemurgy, pledgee, had been pledged to him by Charles Seaman who was present at the meeting representing both himself and the plaintiff. No challenge to the vote of the stock in the name of Rosemurgy, as pledgee, was made and the legality of this vote was never questioned until the institution of this suit.

At the time of the vote on this resolution the records of the company show that Daniel Waite, receiver of the Iron National Bank, was the owner of 125 shares which were voted by Mr. Waite in the affirmative. No challenge was made at the time this stock was voted. No challenge could be properly made because the stock record of the corporation and the record in this case show that Mr. Waite, as receiver of the bank, was the owner of the stock in question and had a right to vote the same at a stockholders' meeting. We, therefore, find that the resolution providing for the amendment of the articles of incorporation which increased the capital stock

and fixed a price for the sale of such increase was adopted by a two-thirds vote of all of the outstanding stock of the corporation, and that there was no fraud, either actual or constructive, in the action of the stockholders in amending the articles of incorporation.

In support of his contention that a two-thirds vote for the amendment was necessary, plaintiff relies upon Act No. 327, § 19, Pub. Acts 1931, which reads as follows:

"Shares without par value may be issued or subscriptions therefor taken by corporations formed or existing under this act from time to time for such consideration as may be fixed from time to time by the board of directors, unless in the articles the power to fix such consideration shall have been reserved to the shareholders, in which event such power shall be exercised by the shareholders by consent in writing (a) without a meeting, or (b) by vote at a meeting, in each case by the holders of record of two-thirds of the total number of shares of each class of stock then outstanding and entitled to vote in respect thereto."

The foregoing provision pertains only to the fixing of the consideration at which the no par stock is to be issued, and would apply only after the resolution providing for issuance had been passed. The point is controlled by Act No. 327, § 43, Pub. Acts 1931, which reads, in part:

"Any corporation formed or existing under this act may at a meeting of the shareholders duly called and held amend its articles without limitation so long as the articles as amended would have been authorized by this act as original articles, by the vote of the holders of the majority of its shares entitled to vote."

It is undisputed that this amendment was adopted by the vote of a majority of the holders of shares entitled to vote. This section is discussed by Wilgus & Hamilton, Michigan Corporation Law, p. 292:

"Act No. 84, Pub. Acts 1921, required a two-thirds vote to amend the capital structure, although equally vital changes (such, for example, as of corporate objects) might be accomplished by a mere majority, the present act permits a majority to make its will effective as to all types of authorized amendments."

It would therefore appear that a majority of the stockholders may pass any amendment "so long as the articles as amended would have been authorized by this act as original articles."

3. Plaintiff contends that the offer of the corporation to its stockholders permitting them to subscribe for their proportionate part of the 10,000 shares and fixing the terms of payment has been changed by action of the board of directors which amounted to a preferential offer and as such was illegal, void and fraudulent, and that the stockholders who subscribed for the additional stock should be required to surrender the same for cancellation and the corporation required to pay to them the amount received therefor.

The record is conclusive that plaintiff's brother, Charles Seaman, had knowledge of every action taken at stockholders' and directors' meetings prior to 1934, and in view of the relations between him and plaintiff hereinbefore referred to and which will be later more fully discussed, we hold that the knowledge of Charles Seaman is chargeable to plaintiff.

"A shareholder represented by proxy at a meeting is chargeable with knowledge of facts connected with the proceedings of that meeting, known to his proxy." 7 R. C. L. p. 342.

"As a rule the stockholder is chargeable with notice of what takes place at a meeting at which he is represented by proxy, and of matters reported thereto." 5 Fletcher, Cyclopedia Corporations (Perm. Ed.), § 2061.

See, also, *Thames* v. *Central City Ins. Co.*, 49 Ala. 577; *Gray* v. *Aspironal Laboratories* (C. C. A.), 24 Fed. (2d) 97; *Rossing* v. *State Bank of Bode*, 181 Iowa, 1013 (165 N. W. 254); *In re Mathiason Manfg. Co.*, 122 Mo. App. 437 (99 S. W. 502).

4. Plaintiff contends that after stock was subscribed for by stockholders to be paid for in instalments, and after the first of such instalments was paid, that neither the stockholders nor directors could pass a resolution canceling the balance due upon such subscriptions without the consent of all of the stockholders. By this contention plaintiff assumes that such action was taken either at a stockholders' or directors' meeting. A diligent search of the record fails to disclose that any action was ever taken at a stockholders' or directors' meeting canceling the balance due from stockholders upon their original subscriptions to the newly-authorized capital stock.

5. Plaintiff insists that, having shown that there has been a preference made in the offer of subscription to other stockholders, he is entitled to demand his *pro rata* share of the increase of the capital stock on the same basis as other stockholders, and claims that he instituted this action immediately following the time such facts came to his knowledge.

We reiterate that the brother of plaintiff had full knowledge and information of all acts of the corporation from the time of the original incorporation up to the year 1934 when his term of office as a director was terminated, and his knowledge is chargeable to plaintiff. Testimony taken upon the hear-

ing, we think, discloses the real reason why neither plaintiff nor his brother, Charles Seaman, subscribed for their proportionate part of the newly-authorized stock. During the fall of 1932 and spring of 1933 when the corporation was reorganizing, attempting to find some way to prevent complete demoralization, Mr. Charles Seaman had said the stock "was not worth the paper that it was written on—that it was ready for the ash can." He made this statement on numerous occasions during the fall of 1932 and spring of 1933. There is testimony that Charles Seaman advised plaintiff not to put any money into the stock—"that the company was through." Testimony to this effect was given by Mr. P. J. O'Donnell, one of the defendants, who testified that he had a conversation with plaintiff in August, 1934, and that plaintiff asked him how the theater was coming. The witness related the following conversation:

"I said, 'Meyer, it begins to look as though we were working the thing out all right.' Then he said, 'That's what I understand. Pat, do you imagine there is any way that I could prevail upon the stockholders or board of directors at this time to pay in the required money and establish my position the same as the others that have paid their money in on the subscriptions?' and I said, 'Well, Meyer, I don't hardly see how that could be accomplished.

" 'In my opinion you showed you weren't interested and those boys have put their money in and saved the situation and it looks as though we are coming out whole and it seems unreasonable to make the request. I personally, feel they wouldn't agree to it.' That was all that was said there and he said, 'How much money would it have cost me to have taken my subscription?' I said, 'Well, as near as I can estimate, Meyer, it would be a matter of about $500 but when I get back to Ironwood I will send you the figure,' and then he said, 'My God, isn't that

terrible?' He said, 'Charles (meaning his brother) told me that you folks were all through and not to put a dollar into it.' "

This testimony was contradicted by plaintiff. Mr. Charles Seaman, who although present during the trial, was not a witness. We find, therefore, that the only reasonable inference that can be drawn from the testimony and the circumstances disclosed by the record is that the plaintiff had the same knowledge of the facts relative to the actions of the stockholders, directors and officers as did his brother, Charles, and that he relied upon the latter's counsel and advice with reference to the advisability of going along with the other stockholders in the plan of reorganization and attempt to refinance and rebuild the corporation. Being charged with full knowledge of the facts and having failed to exercise his pre-emptive rights, plaintiff must be held to have waived the same.

"The stockholder * * * who brings his action against the corporation for damages for refusal to allow him to subscribe for the new stock, or for selling the stock to someone else, or for depriving him in any other way of it, must allege and prove that he demanded the stock and offered to subscribe and pay for it in the regular way within the time fixed for such subscriptions." (1 Cook on Corporations [8th Ed.], § 286.)

See *Hammond* v. *Edison Illuminating Company of Detroit,* 131 Mich. 79 (100 Am. St. Rep. 582) ; *Wilson* v. *Bank of Montgomery County,* 29 Pa. 537 ; *Hoyt* v. *Shenango Valley Steel Co.,* 207 Pa. 208 (56 Atl. 422) ; 7 R. C. L. p. 206.

The doctrines of waiver, estoppel and acquiescence are considered as of one family in the law, and another, closely akin to these, is the doctrine of laches.

In this case plaintiff was given an opportunity to exercise his right to subscribe for his proportionate share of the stock made available to stockholders of the corporation. He had at least constructive knowledge of all actions taken by the corporation and did not see fit to avail himself of his right to subscribe to the whole or any part of his proportionate share. A reasonable time was fixed within which each stockholder should avail himself of this right; the time for such subscription was extended; plaintiff had notice thereof and still did not see fit to avail himself of the opportunity. We must, therefore, hold that he intentionally relinquished his pre-emptive rights.

The record clearly shows that in the summer and fall of 1932 plaintiff had full knowledge of the distressed financial condition of the corporation; and had full knowledge of each and every act taken by it in attempting to improve the situation. He stood by and saw practically all of the other stockholders subscribe and pay for new stock. He knew the purpose to be an attempt to revive the corporation, and instead of acting with the other stockholders, it is apparent that he relied upon the advice of his brother, his "*alter ego*," that the company was "all through and not to put a dollar into it." Nearly two years thereafter, in August, 1934, he received information that it was beginning to appear as if those who had assumed the risk in attempting to revive the company "were working the thing out all right." Plaintiff then, evidently for the first time, realized that he had ignored an opportunity, and asked his informant, "do you imagine there is any way that I could prevail upon the stockholders or board of directors at this time to pay in the required money and establish my position the same as the others that have paid their money in on the subscriptions?"

It must be held that plaintiff, by his waiver of his stock subscription right and his subsequent conduct with the knowledge of the facts, acquiesced in the corporate acts of the corporation and the acts and conduct of its officers and board of directors, and that it would be manifestly unjust and inequitable to permit him to succeed in this suit and thus place himself on the same plane as those, who by investing their money saved the corporation from bankruptcy.

"Certainly, if the stockholder persistently, continuously, and steadfastly refuses to avail himself of the opportunity to subscribe for his *pro rata* share of treasury stock about to be offered for sale, meeting every demand with unequivocal refusal, being influenced by the financial difficulties of the corporation, he cannot later, after the stock has acquired great value, owing to a fortunate adjustment of its affairs, set aside a sale of the stock, or compel an accounting, for, though he is entitled to his opportunity to subscribe to the additional issue, he is compelled to exercise that right within a reasonable time, and here he not only fails, but manifests his intention of not profiting by the opportunity in the most unmistakable terms. *Conklin* v. *United Construction & Supply Co.*, 166 App. Div. 284 (151 N. Y. Supp. 624), affirmed without opinion, 219 N. Y. 555 (114 N. E. 1063), and reargument denied in 219 N. Y. 626 (114 N. E. 1063)." 52 A. L. R. 227.

There was no claim made that any action taken by the corporation, its officers or board of directors was not in good faith. Neither is there any claim that there was any intentional wrong done to plaintiff, nor any act of fraud perpetrated by the corporation or any of its officers. The record speaks to the contrary. In a letter written by Mr. Humphrey, one of the attorneys for plaintiff, to the president of the corporation on January 30, 1935, he stated,

"I have advised Charles Seaman and Meyer Seaman that this was a fraud upon their right as stockholders, and in saying this, I want you and the officers of the Ironwood Amusement Corporation to understand that, by using the word 'fraud,' I do not mean that any intentional wrong was done to Charles or Meyer Seaman but that what was done amounts to fraud in law."

It is clearly apparent from this letter that plaintiff nearly a year and a half before this suit was instituted was advised by his attorney that no intentional wrong had been consummated but that a constructive fraud had been perpetrated which entitled him to relief. Instead of acting promptly then, if he had not already lost his right to complain, he stood by, permitting the position of defendants to become more entrenched, when it was his duty if he had a grievance to act without delay and in an unequivocal manner. We must, therefore, hold that he was guilty of laches to the extent that he is precluded from obtaining equitable relief. The rule is broadly stated in *Baker* v. *Spokane Saving Bank* (C. C. A.), 71 Fed. (2d) 487, as follows:

"Laches is a defense to the action of a minority stockholder or shareholder to set aside corporate acts whether fraudulent or *ultra vires.*"

See, also, *Bonnet* v. *First National Bank of Eagle Pass,* 24 Tex. Civ. App. 613 (60 S. W. 325); 11 Fletcher, Cyclopedia Corporations (Perm. Ed.), § 5146; 10 R. C. L. p. 730.

The decree is affirmed, with costs to defendants.

WIEST, C. J., and BUTZEL, BUSHNELL, SHARPE, POTTER, NORTH, and McALLISTER, JJ., concurred.